United States District Court
Southern District of Texas
**ENTERED**
June 22, 2018
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

KOREY RYCHORCEWICZ,          §
individually and on behalf of §
similarly situated individuals, §
                             §
    Plaintiff,               §
                             §
v.                           §          CIVIL ACTION NO. H-16-2
                             §
WELLTEC, INC.,               §
                             §
    Defendant.               §

### MEMORANDUM AND RECOMMENDATION

Pending before the court[1] is Defendant Welltec, Inc.'s ("Defendant") Motion for Summary Judgment (Doc. 89) and Plaintiffs' Motion to Strike (Doc. 90). The court has considered the motions, the responses, the replies, all other relevant filings, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Plaintiffs' motion to strike be **DENIED** and Defendant's motion for summary judgment be **GRANTED**.

## I.  Case Background

Plaintiff Korey Rychorcewicz ("Rychorcewicz") filed this action alleging that Defendant violated the Fair Labor Standards Act[2] ("FLSA") by misclassifying him and other similarly situated field engineers as exempt employees and failing to pay overtime.[3]

---

[1]     This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. See Doc. 92, Ord. Dated Oct. 6, 2017.

[2]     See 29 U.S.C. §§ 201-219.

[3]     See Doc. 1, Pl.'s Compl.

## A.  <u>Factual Background</u>

Defendant, an international oil and gas company headquartered in Katy, Texas, created and provided well technologies and solutions, with the goal of helping its clients to "optimize their oil and gas production and increase reservoir drainage."[4] Defendant's satellite offices were located in Midland, Texas; San Antonio, Texas; Minot, North Dakota; Houma, Louisiana; Cranberry Township, Pennsylvania; and Deadhorse, Alaska.[5]  Offices in Colorado and Fort Worth, Texas, closed in 2015, and the office in Bridgeville, Pennsylvania moved to Cranberry Township, Pennsylvania.[6]

### 1.  Field Engineers

Field engineers were utilized at all of Defendant's operations within the United States[7] to "provide on-site intervention services at [Defendant's] customers' well sites to ensure that their oil and gas wells are well maintained and stay in production."[8]  The duties of field engineers comprised of "rigging up and rigging down a Welltec tractor, which gets tools and equipment in and out of a deep well, operating oilfield machinery, and providing other

---

[4]   Doc. 89-2, Ex. 1 to Def.'s Mot. for Summ. J., Decl. of Alferez p. 2.

[5]   <u>See</u> <u>id.</u>

[6]   <u>See</u> <u>id.</u>

[7]   Field engineers were employed to help with the entire United States operation except the office in Katy, Texas.  <u>See</u> <u>id.</u>

[8]   <u>Id.</u>

troubleshooting, maintenance, and intervention services."[9]  There were four levels of field engineers, including: field engineer trainee, field engineer 2, field engineer, and senior field engineer.[10]  Field engineers were assigned to specific satellite offices from which they primarily operated.[11]  However, a field engineer's primary base of operations could be moved permanently or temporarily depending on Defendant's needs.[12]

Field engineers drove Defendant's vehicles from the satellite offices to wellsites, sometimes attaching a trailer in order to transport "various tools and other oil field equipment that the Field Engineer [needed] to perform the assignment at the customer well site."[13]  Olivier Alferez ("Alferez"), an operations manager for Defendant, testified that "[e]very U.S.-based Field Engineer can expect to be called upon to drive interstate in a Welltec vehicle to a customer well site in the course of his duties."[14] Field engineers were required to turn in monthly work reports to track their work, specifying the work performed and the location of

---

[9]    Id.

[10]   See id.

[11]   See id. p. 3.

[12]   See id.

[13]   Id.

[14]   Id.

the job sites.[15]   These monthly work reports show that Plaintiffs regularly traveled to other states in the course of their job duties as field engineers.[16]

## 2.  Defendant's Fleet of Vehicles

Defendant is registered with the United States Department of Transportation ("DOT") as a motor carrier, registration number DOT #1546653, to carry oil field equipment, machinery, and large objects.[17]   In the course of their duties, Plaintiffs traveled interstate, and traveled in company vehicles, personal vehicles, vehicles rented from Enterprise, or by airplane.[18]

---

[15]    See id.

[16]    See Doc. 113-5, Ex. 32 to Def.'s Mot. for Summ. J., Interstate Travel of Pls. Referenced in Pls.' Opposition Briefs pp. 1-13.

[17]    See id. p. 2; Doc. 89-8, Ex. 7 to Def.'s Mot. for Summ. J., Def.'s Motor Carrier Registration p. 1.

[18]    See Doc. 89-5, Ex. 4 to Def.'s Mot. for Summ. J., Dep. of Pl. Michael P. Summers pp. 94-100 (discussing out of state travel); Doc. 89-9, Ex. 8 to Def.'s Mot. for Summ. J., Pl. Antoni[o] Alaniz, Jr.'s Answers & Objs. to Def.'s 1st Interrogs. & Reqs. for Prod. p. 10 (Plaintiff undertook a "[l]ot of driving to New Mexico, Oklahoma, Lousiana [sic], and Arkansas . . . I never used a personal vehicle.  We always used a company vehicle or Welltec would rent us a vehicle from Enterprise."); Doc. 89-10, Ex. 9 to Def.'s Mot. for Summ. J., Pl. Stang Gappa's Answers & Objs. to Def.'s 1st Interrogs. & Reqs. for Prod. p. 9 ("I have traveled to North Dakota, Colorado, Wyoming, South Dakota, Montana, Texas, Pennsylvania, New York, West Virginia, Texas, Oklahoma, New Mexico. I traveled by company pickup truck and airplane.  I traveled to these locations numerous times throughout my employment."); Doc. 89-11, Ex. 10 to Def.'s Mot. for Summ. J., Pl. Kevin Hoffman's Answers & Objs. to Def.'s 1st Interrogs. & Reqs. for Prod. pp. 9-10 ("Sites I have worked in include, Pennsylvania, Ohio, West Virginia, Louisiana, Michigan, Colorado, North Dakota, Montana, New Mexico, Texas, Oklahoma, Alaska . . . I traveled by company truck for all jobs from the Welltec Base.  I mainly traveled by airport to the states themselves . . . I never traveled by personal vehicle.  I was always in a company provided vehicle."); Doc. 89-12, Ex. 11 to Def.'s Mot. for Summ. J., Pl. Alex Mueller's Answers & Obj. to Def.'s 1st Interrogs. & Reqs. for Prod. p. 9 ("I have been to Oklahoma, New Mexico, Colorado & Louisiana . . . I have driven and flown, I have used a company vehicle most of the time but have used a personal vehicle as well."); Doc. 89-13, Ex. 12 to Def.'s Mot. for Summ. J., Pl. Rychorcewicz's Answers & Objs. to Def.'s 1st Interrogs. & Reqs. for Prod. p. 8 ("Mr.

Defendant's fleet was made up of vehicles that largely consisted of those with a gross vehicle weight rating ("GVWR") of over 10,000 pounds.[19]

Per the vehicle inventory spreadsheets, Defendant's vehicles consisted of the following:[20]

| Base | July 2013 | June 2015 | March 2017 |
|------|-----------|-----------|------------|
| Fort Worth, Texas | Two Dodge Calibers<br><br>Ten trucks with GVWR 10,000 or greater | Five trucks with GVWR over 10,000 and one Dodge Ram 3500 with unspecified GVWR | (Base closed) |
| San Antonio, Texas | Five trucks with GVWR at or over 10,000 | Four F-350s with GVWR over 10,000 | Four F-350s (over 10,000 GVWR) and one F-350 with no specified GVWR<br><br>One Freightliner (GVWR of 53,887) |

Rychorcewicz has worked in Texas, Oklahoma and New Mexico and has driven a company pick up truck."); Doc. 89-14, Ex. 13 to Def.'s Mot. for Summ. J., Dep. of Pl. Rychorcewicz pp. 41-47 (discussing driving and flying to bases in other states); Doc. 89-15, Ex. 14 to Def.'s Mot. for Summ. J., Pl. Ivan Virruet's Answers & Objs. to Def.'s 1st Interrogs. & Reqs. for Prod. p. 9 ("I drove company pickup trucks in Alaska, Ohio, West Virginia, Louisanna [sic], north Dakota [sic] south Dakota, and Wyoming.").

[19]    See Doc. 89-2, Ex. 1 to Def.'s Mot. for Summ. J., Decl. of Alferez p. 4; Doc. 89-2, Ex. 1-A to Def.'s Mot. for Summ. J., Welltec Vehicle Inventory Spreadsheets; Doc. 100-3, Ex. B to Def.'s Resp. to Pls.' Mot. to Strike, Suppl. Decl. of Alferez pp. 2-6.

[20]    See Doc. 89-2, Ex. 1-A to Def.'s Mot. for Summ. J., July 2013 Welltec Vehicle Inventory Spreadsheets pp. 1-5; Doc. 89-2, Ex. 1-A to Def.'s Mot. for Summ. J., June 2015 Welltec Vehicle Inventory Spreadsheet pp. 1-4; Doc. 89-2, Ex. 1-C to Def.'s Mot. for Summ. J., March 2017 Welltec Vehicle Inventory Spreadsheet pp. 1-2.  The vehicle inventory spreadsheets were updated every few months, but the court has not included every single update in this chart. See Doc. 89-2, Ex. 1-A to Def.'s Mot. for Summ. J, Welltec Vehicle Inventory Spreadsheets.

| Midland, Texas | Four trucks with GVWR over 10,000 | Five trucks with GVWR over 10,000 | Four Ford F-350s (over 10,000 GVWR) and one F-350 with no specified GVWR<br><br>One wireline truck with a GVWR of 52,000 |
|---|---|---|---|
| Pennsyl-vania | Nine trucks with GVWR at or over 10,000 | Four Ford F-350s with GVWR over 10,000 | Three Ford F-350s with GVWR of 11,500 |
| Minot, ND | Nine trucks with GVWR at or over 10,000 | Five Ford F-350s with GVWR over 10,000 | Eight F-350s with GVWR over 10,000 |
| Alaska | Three trucks with GVWR over 10,000 and one Ford F-350 with no specified GVWR | Five trucks with GVWR over 10,000 | Two F-350s with GVWR over 10,000<br><br>One F-450 with GVWR over 10,000<br><br>One Dodge Ram 3500 with GVWR of 11,500 |
| Houma, LA | Three trucks with GVWR under 10,000 | Two trucks with GVWR under 10,000 | |
| Colorado | One Dodge Ram 3500 with GVWR of 10,100<br><br>One freightliner wireline truck with no specified GVWR | Two Dodge Ram 3500s with no specified GVWR<br><br>One freightliner with GVWR of 53,887<br><br>Two trucks with GVWR over 10,000 | |

Alferez   testified   that   Defendant   recorded   the   GVWR   of   its

vehicles and worked "to homogenize its vehicle fleet with Ford F-350s (which all have a GVWR above 10,000 pounds)."[21]   Bill Beck ("Beck"), a field engineer, and Summers testified that they drove Ford F-350s during their employment with Defendant.[22]   Additionally, trailers were sometimes attached to vehicles for transportation of items, adding additional weight.[23]

### 3.   Other Vehicles Driven by Plaintiffs

Plaintiffs contend that other, smaller vehicles were driven some of the time, and that some of the larger vehicles were modified by Defendant.

Plaintiff Antonio Alaniz testified that when he traveled to out-of-state sites as a field engineer, he drove vehicles, including Dodge Calibers, that were owned by Welltec.[24]   Plaintiff Stang Gappa ("Gappa") testified that he "drove quite a few rental cars throughout [his] employment," including a Nissan Cube, between Fort Collins, Colorado, and Wyoming on "numerous occasions."[25]   In addition to these smaller vehicles, Gappa also explained that some

---

[21]    Doc. 89-2, Ex. 1 to Def.'s Mot. for Summ. J., Decl. of Alferez p. 4.

[22]    See Doc. 89-16, Ex. 15 to Def.'s Mot. for Summ. J., Decl. of Beck p. 4 ("I drove an F-350 truck with no attachments every week.").

[23]    See Doc. 89-2, Ex. 1-A to Def.'s Mot. for Summ. J., Welltec Vehicle Inventory Spreadsheets; Doc. 89-6, Ex. 5 to Def.'s Mot. for Summ. J., Dep. of Alaniz pp. 32-33; Doc. 89-7, Ex. 6 to Def.'s Mot. for Summ. J., Dep. of Virruet p. 51-53, 55, 71-72, 91-92, 96; Doc. 89-14, Ex. 13 to Def.'s Mot. for Summ. J., Dep. of Rychorcewicz pp. 46-48, 128.

[24]    See Doc. 95-2, Ex. 1 to Pl.'s Resp., Dep. of Pl. Antonio Alaniz pp. 31-32.

[25]    Doc. 95-3, Ex. 2 to Pl.'s Resp., Dep. of Pl. Gappa pp. 176-77.

of the heavy duty trucks at satellite offices in Pennsylvania, Texas, and Colorado had their back seats removed in order to carry equipment.[26]   Plaintiff Kevin Hoffman drove a Dodge Caliber owned by the Fort Worth office from Midland to New Mexico for a job.[27] Rychorcewicz recalled renting vehicles from Enterprise and other car rental companies, including a Ford F-250, a Jeep Wrangler, a Chevrolet 250, and a Chrysler 200.[28]   In his deposition, Plaintiff Alexander Henry Mueller ("Mueller") explained that the driver's logs were not very accurate and on multiple occasions he drove a Jeep Wrangler located at the San Antonio office.[29]   Mueller also stated that the San Antonio office had, at certain times, a small Chrysler car, a Dodge Ram 2500, a Chevrolet Silverado, and a Jeep Patriot.[30]   The Jeep Patriot was rented by Mueller, and Mueller also drove a Dodge 1500 when he was on-site in Colorado.[31]   Plaintiff Michael Summers drove his personal vehicle, a Honda Civic, to a well site at least one time.[32]

## B.   Procedural Background

---

[26]    See id. pp. 204-06.

[27]    See Doc. 95-4, Ex. 3 to Pl.'s Resp., Dep. of Pl. Kevin Hoffman pp. 209-10.

[28]    See Doc. 95-5, Ex. 4 to Pl.'s Resp., Dep. of Pl. Rychorcewicz p. 96.

[29]    Doc. 95-6, Ex. 5 to Pl.'s Resp., Dep. of Pl. Mueller pp. 99-100.

[30]    See id. pp. 101, 104, 108, 110.

[31]    See id. pp. 110, 116.

[32]    See Doc. 95-7, Ex. 6 to Pl.'s Resp., Dep. of Pl. Michael Summers p. 140.

Rychorcewicz filed this lawsuit on January 2, 2016, alleging that Defendant violated the FLSA.[33] Rychorcewicz subsequently filed a motion to certify a class, requesting that the court conditionally certify a class of field engineers.[34]  On April 27, 2016, the court certified the following class: "All Field Engineers and Field Engineer Trainees employed by Welltec, Inc. at any time from April 27, 2013."[35]  Notice was allowed, and Defendant was ordered to turn over contact information for current and former employees who fell within the class definition.[36]  As a result, fifty-one additional field engineers (collectively, "Plaintiffs") opted into this lawsuit.[37]

On September 15, 2017, Defendant filed the pending motion for summary judgment, contending that Plaintiffs were properly classified as exempt to the FLSA under the Motor Carrier Act ("MCA").[38]  Plaintiffs separately filed a response and a motion to strike certain exhibits attached to Defendant's motion, and updated its response with supplemental exhibits.[39]  Defendant later filed

---

[33]     See Doc. 1, Pl.'s Compl.

[34]     See Doc. 21, Pl.'s Mot. for Conditional Certification.

[35]     Doc. 26, Ord. Dated Apr. 27, 2016 p. 1.

[36]     See id.

[37]     See Doc. 89, Def.'s Mot. for Summ. J. p. 2.

[38]     See id. p. 1.

[39]     See Doc. 90, Pls.' Mot. to Strike; Doc. 95, Pls.' Resp. to Def.'s Mot. for Summ. J.

two notices of new authority, bringing the court's attention to two recently decided cases bearing directly on this case: <u>Encino Motorcars, LLC v. Navarro</u>, __ U.S. __, 138 S.Ct. 1134 (2018) and <u>Carley v. Crest Pumping Techs.</u>, 890 F.3d 575 (5th Cir. 2018).[40]

## II.   Plaintiffs' Motion to Strike

Plaintiffs challenge some of Defendant's summary judgment exhibits on hearsay and authentication grounds.

## A.   <u>Legal Standard</u>

A party must support its factual positions on summary judgment by citing to particular evidence in the record.  Fed. R. Civ. P. 56(c)(1).  Federal Rule of Civil Procedure 56(c)(2) allows a movant to object to exhibits that "cannot be presented in a form that would be admissible in evidence" under the Federal Rules of Evidence.

Only relevant evidence is admissible.  Fed. R. Evid. 402. Relevant evidence has a "tendency to make a fact more or less probable than it would be without the evidence" and relates to a fact "of consequence in determining the action."  Fed. R. Evid. 401.  Affidavits or declarations supporting summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P.

---

[40]   <u>See</u> Doc. 114, Def.'s Not. of Suppl. Authority in Support of its Mot. for Summ. J.

56(c)(4).  The court may strike an affidavit that violates this
rule.  <u>Akin v. Q-L Investments, Inc.</u>, 959 F.2d 521, 530 (5th Cir.
1992).   Conclusory allegations, unsubstantiated assertions,
improbable inferences, and speculation are not competent evidence.
<u>Roach v. Allstate Indem. Co.</u>, 476 F. App'x 778, 780 (5th Cir.
2012)(unpublished)(citing <u>S.E.C. v. Recile</u>, 10 F.3d 1093, 1097 (5th
Cir. 1993)).

Hearsay is not admissible evidence.  Fed. R. Evid. 802.
Hearsay is an out-of-court statement that is offered for "the truth
of the matter asserted in the statement."  Fed. R. Evid. 801.
Statements offered against an opposing party made "by the party in
an individual or representative capacity" are not hearsay.  Fed. R.
Evid. 801(d)(2)(A).   The Federal Rules of Evidence also list
exceptions to the rule against hearsay.  Fed. R. Evid. 803-804,
807.

For purposes of authentication, Federal Rule of Evidence
901(a) requires "evidence sufficient to support a finding that the
item is what the proponent claims it is."  Circumstantial evidence,
such as the document itself and the circumstances surrounding its
discovery, is sufficient for authentication.  <u>In re McLain</u>, 516
F.3d 301, 308 (5th Cir. 2008).  The Fifth Circuit "does not require
conclusive proof of authenticity before allowing the admission of
disputed evidence . . . It merely requires some evidence which is
sufficient to support a finding that the evidence in question is

what its proponent claims it to be." Id. (quoting United States v. Arce, 997 F.2d 1123, 1128 (5th Cir. 1993)).

## B. **Business Records**

Plaintiffs challenge exhibit 1-A, Defendant's vehicle inventory spreadsheets, on hearsay grounds. Plaintiffs assert that these records do not fall under the business records exception to the hearsay rule because the supporting affidavit of Olivier Alferez ("Alferez") does not properly authenticate the records and that David McQueen ("McQueen") should have provided the authentication. Plaintiffs also contend that the records are untrustworthy.

The business records exception to the hearsay rule reads as follows:

"The following are not excluded by the rule against hearsay . . .

**(6) Records of a Regularly Conducted Activity.** A record of an act, event condition, opinion or diagnosis if:

(A) the record was made at or near the time by-or from information transmitted by-someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by certification that

complies with Rule 902(11) or (12) or with a
statute permitted certification; and

(E)  the opponent does not show that the source of
information or the method or circumstances of
preparation       indicate     a     lack    of
trustworthiness.

Fed. R. Evid. 803(6).

## 1.  Authentication

For business records to be admissible under the 803(6)
exception to the hearsay rule, "either the custodian of the
business records or 'other qualified witness'" must provide
authentication. U.S. Commodity Futures Trading Comm'n v. Dizona,
594 F.3d 408, 415 (5th Cir. 2010)(quoting United States v. Brown,
553 F.3d 768, 792 (5th Cir. 2008)).   The Fifth Circuit has
specifically stated that "[t]here is no requirement that the
witness who lays the foundation be the author of the record or be
able to personally attest to its accuracy." Id. (quoting Brown,
553 F.3d at 792).   Rather, "[a] qualified witness is one who can
explain the record keeping system of the organization and vouch
that the requirements of Rule 803(6) are met." Id. (quoting Brown,
553 F.3d at 792).

Alferez was the operations manager for Defendant beginning in
October 2016.[41]  In his declaration, Alferez provides the foundation
for exhibit 1-A.  As operations manager, Alferez was in charge of

---

[41]   See Doc. 89-2, Ex. 1 to Defs.' Mot. for Summ J., Decl. of Alferez p.
1.

oversight of Defendant's vehicle fleet, a role previously filled by McQueen, who created the records in this exhibit.[42]  Alferez stated that exhibit 1-A:

> is a true and correct copy of the vehicles inventories created and maintained by Mr. McQueen.  These were kept and maintained by [Defendant] in the regular course of its business . . . Mr. McQueen maintained these vehicle inventory spreadsheets in his office in [Defendant's] U.S. headquarters in Katy, Texas until the time of his retirement in June 2015.[43]

The court finds that Alferez is qualified to testify to the authenticity of these records and properly laid the foundation in his declaration.  Additionally, attached to Defendant's response as exhibit A, Defendant provided a declaration from McQueen testifying to the basis of his knowledge and the process he utilized in creating the spreadsheets provided in exhibit 1-A.[44]  McQueen stated that he created these records in the regular course of his business.[45]   To any extent that Alferez's declaration did not adequately provide the foundation for these records, McQueen's declaration gives more then enough support to authenticate the accuracy of exhibit 1-A.  Plaintiffs' objection is overruled.

## 2.  Trustworthiness

Plaintiffs also assert that exhibit 1-A lacks trustworthiness

---

[42]    See id. p. 5.

[43]    Id. pp. 4-5.

[44]    See Doc. 100-2, Ex. A to Def.'s Resp. to Pls.' Mot. to Strike, Decl. of McQueen pp. 1-3.

[45]    See id. p. 3.

because there are differences between the listed GVWR and online reports of the gross weight of these vehicles.  Plaintiffs looked to http://bigrigvin.com/our-reports/ for gross weights and contend that these numbers do not match the numbers provided by McQueen in exhibit 1-A, making it untrustworthy.  Defendant asserts that the record is accurate and contest Plaintiffs' reliance on the bigrigvin.com data; Defendant also argues that the accuracy of the records bears on their weight, not their admissibility, citing U.S. v. Smith, 804 F.3d 724, 729 (5th Cir. 2015).

In Smith, the Fifth Circuit stated that it had "explained that the district court 'has great latitude on the issue of trustworthiness'" of business records, with the burden resting on the party challenging the records.  804 F.3d at 729 (quoting United States v. Duncan, 919 F.2d 981, 986 (5th Cir. 1990)).  The witness providing foundation for the admissibility of the business record does not have to have personal knowledge that the record is accurate.  Id.  Explaining further, the Fifth Circuit stated that "'courts should not focus on questions regarding the accuracy' of a record in making the trustworthiness determination  required by Rule 803, because the jury is responsible for assessing credibility and deciding what weight to afford admitted evidence."  Id. (quoting Moss v. Ole S. Real Estate, Inc., 933 F.2d 1300, 1307 (5th Cir. 1991)).  Therefore, the Fifth Circuit has "repeatedly recognized that a challenge to the accuracy or completeness of a

record goes to its weight, not its admissibility."   <u>Id.</u> at 730
(citing cases).

Plaintiffs challenge the accuracy of the weights provided in
Defendant's records, contending that because they do not match the
weights found on a website, that they are uuntrustworthy.
Plaintiffs point to the handwriting on the records as an indication
that the records are untrustworthy.  However, as Defendant points
out, these challenges go to the accuracy of the records, not their
admissibility.  What evidentiary weight should be assigned to a
document is a question for the jury to decide, not the court.
Therefore, Plaintiffs' objection as to the trustworthiness of
Exhibit 1-A is overruled.

To the extent that Plaintiffs challenge the foundation of the
GVWR data, it is supported by McQueen's affidavit.  Plaintiffs
state that "it is not apparent from the record *how* this chart was
filled in."[46] In McQueen's affidavit, he explains that, in creating
the spreadsheets, he would "document the . . . GVWR" and he
"prepared [the spreadsheets] based on [his] own personal inspection
of the vehicle or information provided to me by Field Service
Managers at [Defendant's] various bases."[47]  On the charts, it
states that "[t]he GVWR Information is found on the driver's

---

[46]      <u>See</u> Doc. 90, Pls.' Mot. to Strike p. 7.

[47]      Doc. 100-2, Ex. A to Def.'s Resp. to Pls.' Mot. to Strike, Decl. of
McQueen pp. 2-3.

door/door jamb along with tire pressure data."[48]   Additionally, Defendant has since provided pictures from door jambs demonstrating the GVWR of certain vehicles.  This provides the foundation for the GVWR data contained in exhibit 1-A.

**C.**   **<u>National Highway Traffic Safety Administration Records</u>**

Plaintiffs argue that Exhibit 17 to Defendant's motion, the National Highway Traffic Safety Administration ("NHTSA") records, should be stricken as they are not properly authenticated and do not comport with the public records exception to the hearsay rule. Defendant cites to Federal Rule of Evidence 902(5) to support its argument that this exhibit is self-authenticating, as it is a printout from a government website and also contends that the records fall under the public records exception of the hearsay rule, Federal Rule of Evidence 803(8).

**1.**   **Authentication**

Plaintiffs cite <u>St. Luke's Cataract and Laser Institute, P.A. v. Sanderson</u>, No. 8:06-CV-223-T-MSS, 2006 WL 1320242, at *1 (M.D. Fla. May 12, 2006)(unpublished), for the proposition that in order to authenticate printouts from a website, a party must provide "some statement or affidavit from someone with knowledge [of the website] . . . for example [a] web master or someone else with personal knowledge would be sufficient."  Plaintiffs also contend

---

[48]   <u>See, e.g.,</u> Doc. 89-2, Ex. 1-A to Def.'s Mot. for Summ. J., Welltec Vehicle Inventory Spreadsheets p. 6.

that this court takes "a naturally suspicious view of evidence procured from the Internet," and cite St. Clair v. Johnny's Oyster & Shrimp, Inc., 76 F. Supp.2d 773, 775 (S.D. Tex. 1999), in support of this proposition.

Federal Rule of Evidence 902(5) states: "The following items of evidence are self-authenticating; they require no extrinsic evidence of authenticity to be admitted . . . (5)  Official Publications.  A book, pamphlet, or other publication purporting to be issued by a public authority."  Fed. R. Evid. 902(5).

It is well-settled that information found on government websites is self-authenticating under this rule.  See Nat'l Urban League, Inc. v. Urban League of Greater Dallas & N. Cent. Tex., Inc., CIVIL ACTION NO. 3:15-CV-3617-B, 2017 WL 4351301, at *6 (N.D. Tex. Sept. 29, 2017)(slip op.)("Printouts from government web sites are self-authenticating under Federal Rule of Evidence 902(5)."); Brown v. JNH Invs., Inc., CIVIL ACTION NO. 4:16-CV-00675-ALM-CAN, 2017 WL 3205716, at *2 (E.D. Tex. July 7, 2017)(slip op.)("Further, government websites in particular '[are] self authenticating under Rule 902(5).'"); EEOC v. United Bible Fellowship Ministries, Inc., Civil Action No. 4:13-CV-2871, 2015 WL 12777363, at *4 (S.D. Tex. Mar. 25, 2015)(slip op.)(citing Rule 902(5) in support of the finding that a website published by a governmental authority is self-authenticating); Riverkeeper v. Taylor Energy Co., LLC, 113 F. Supp.3d 870, 881 n.52 (E.D. La. 2015)("[f]ederal courts consider

18

records from government websites to be self-authenticating under Rule 902(5).").

The cases cited by Plaintiffs do not address the real issue of whether printouts from a government website need additional authentication or may be self-authenticated through its web domain name. Defendant's authority clearly supports the proposition that printouts from government websites are self-authenticating. The court agrees and holds that exhibit 17 needs no further authentication under Rule 902(5).

### 2. Public Records Exception

Plaintiffs also argue for exhibit 17's exclusion under the hearsay rule. Defendant contends that this exhibit falls under the public records exception. The court agrees. District courts in the Fifth Circuit have regularly found that printouts from government websites come under the public records exception to the hearsay rule, Federal Rule of Evidence 803(8). See, e.g., Nat'l Urban League, 2017 WL 4351301, at *6; Johnson v. United Healthcare of Tex., Inc., 167 F. Supp.3d 825, 835 (W.D. Tex. 2016); Riverkeeper, 113 F. Supp.3d at 881 n.52; Kew v. Bank of Am., N.A., No. H-11-2824, 2012 WL 1414978, at *3 n.4 (S.D. Tex. Apr. 23, 2012)(unpublished).

In support of their argument, Plaintiffs cite Smith v. Isuzu Motors, Ltd., 137 F.3d 859 (5th Cir. 1998). In that case, the evidence in dispute was not a printout from a government website;

19

rather, the records the court found to be inadmissible were safety memoranda drafted by employees of the NHTSA.  Smith is clearly distinguishable, and the court finds the reasoning outlined in National Urban League, Johnson, Riverkeeper, and Kew to be persuasive.  Therefore, Plaintiffs' objection that exhibit 17 should be excluded as hearsay is overruled.

## D.  **Alferez's Declaration**

In their motion to strike, Plaintiffs argue that the following statement in Alferez's declaration is conclusory: "[a]s of December 2016, all of [Defendant's] vehicles, except the local shop truck (Ford 150) in Houma, had a GVWR above 10,000 pounds.  This remains true today."[49]  The court finds that this statement is supported by the vehicle lists and other exhibits in Defendant's summary judgment evidence and is not conclusory.  Plaintiffs' objection is overruled.

## E.  **March 2017 Vehicle List**

Plaintiffs challenge the evidentiary foundation of the March 2017 vehicle list attached as exhibit 1-C to Defendant's motion. Plaintiffs complain that because exhibit 1-B, the Enterprise rental list, did not contain vehicle GVWRs, the source of that information in exhibit 1-C is unclear.[50]

---

[49]   See Doc. 90, Pls.' Mot. to Strike p. 10 (quoting Doc. 89-2, Ex. 1 to Def.'s Mot. for Summ. J., Decl. of Alferez p. 6).

[50]   Plaintiffs appear to have made a typo in their motion.  They state that the vehicle list from the rental company does not contain the weights, but they call it exhibit C.  Exhibit 1-B is the list from the rental car company and

As explained above, McQueen has averred that the GVWRs were gathered through actual vehicle inspections or information obtained from field managers.  Additionally, Alferez, in his second affidavit, bolsters the GVWRs in exhibit 1-C by attaching photographs of door jambs containing the GVWR of vehicles.  Plaintiffs argue that these photographs were "improperly withheld during discovery" and complain that they requested such photographs in their requests for production.  Plaintiffs seek a ruling that the photographs not be considered.

In a hearing on October 18, 2017, the court gave Defendant until November 17, 2017, to supplement its discovery, thereby extending that deadline.  Defendant filed its response to Plaintiffs' motion to strike attaching the additional photographic evidence on October 10, 2017.  Therefore, production of the photographs was within the discovery deadline set by the court.  The court will consider the photographic exhibits in its consideration of the summary judgment motion.  Plaintiffs' objection is overruled.

### III.  Summary Judgment Standard

Summary judgment is warranted when the evidence reveals that no genuine dispute exists on any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Stauffer v.

---

it does not contain the weights that are contained in exhibit 1-C.

Gearhart, 741 F.3d 574, 581 (5th Cir. 2014).  A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ameristar Jet Charter, Inc. v. Signal Composites, Inc., 271 F.3d 624, 626 (5th Cir. 2001).  To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party.  See Royal v. CCC & R Tres Arboles, L.L.C., 736 F.3d 396, 400 (5th Cir. 2013)(quoting Anderson, 477 U.S. at 248).

The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues.  Celotex Corp., 477 U.S. at 323; Topalian v. Ehrman, 954 F.2d 1125, 1131 (1992).  If the moving party carries its burden, the nonmovant may not rest on the allegations or denials in his pleading but must respond with evidence showing a genuine factual dispute.  Stauffer, 741 F.3d at 581 (citing Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007)).

## IV. Analysis

The Motor Carrier Act ("MCA") exempts employees from the FLSA with "whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49."  29 U.S.C. § 213(b)(1).

For the MCA to apply, an employee must be:

> (1) employed by a motor carrier or private carrier, as
> defined by 49 U.S.C. § 13102, and (2) engage in
> activities of a character directly affecting the safety
> of operation of motor vehicles in the transportation on
> public highways of passengers or property in interstate
> or foreign commerce within the meaning of the MCA.

Spangler v. Mourik, L.P., Civil Action No. H-16-0349, 2017 WL
3412117, at *14 (S.D. Tex. Mar. 8, 2017)(slip op.)(citing 29 C.F.R.
§ 782.2(a)).

Work that falls under activities affecting safety or property
includes "the work of drivers, driver's helpers, loaders, and
mechanics employed by such carriers." 29 C.F.R. § 782.2(b)(1). A
driver is defined as "an individual who drives a motor vehicle in
transportation which is, within the meaning of the MCA, in
interstate or foreign commerce." 29 C.F.R. § 782.3(a). According
to the regulations, the "general rule" is:

> if the bona fide duties of the job performed by the
> employee are in fact such that he is (or, in the case of
> a member of a group of drivers, driver's helpers,
> loaders, or mechanics employed by a common carrier and
> engaged in safety-affecting occupations, that he is
> likely to be) called upon in the ordinary course of his
> work to perform, either regularly or from time to time,
> safety-affecting activities . . . he comes within the
> exemption in all workweeks when he is employed at such
> job . . . Where this is the case, the rule applies
> regardless of the proportion of the employee's time or of
> his activities which is actually devoted to such safety-
> affecting work in the particular workweek, and the
> exemption will be applicable even in a workweek when the
> employee happens to perform no work directly affecting
> "safety of operation."

Allen v. Coil Tubing Servs., LLC, 755 F.3d 279, 284 (5th Cir.

23

2014)(quoting 29 C.F.R. § 782.2(b)(3)).  "On the other hand, where the continuing duties of the employee's job have no substantial direct effect on such safety of operation or where such safety-affecting activities are so trivial, casual, and insignificant as to be de minimis, the exemption will not apply to [the employee] in any workweek so long as there is no change in his duties."  Id. (quoting 29 C.F.R. § 782.2(b)(3)).

The burden of proving an exemption rests on the employer, and, in the past, courts have held that these exemptions are to be narrowly construed against the employer.  Spangler, 2017 WL 3412117, at **4, 15; Gonzalez v. Smith Int'l, Inc., 899 F. Supp.2d 622, 635 (S.D. Tex. 2010).  However, in a recent decision, the Supreme Court cast aside the principle of narrow construction of exemptions to the FLSA.  Encino v. Motorcars, LLC v. Navarro, __ U.S. __, 138 S. Ct. 1134, 1142 (2018).  The Court reasoned that "[b]ecause the FLSA gives no textual indication that its exemptions should be construed narrowly, there is no reason to give [them] anything other than a fair (rather than a narrow) interpretation" and pointed out that the "narrow-construction principle relies on the flawed premise that the FLSA pursues its remedial purpose at all costs."  Id. (citations and internal quotations omitted). Therefore, the Court concluded that the exemptions only should be given a fair reading rather than a narrow construction.  Id.

The Safe, Accountable, Flexible, Efficient Transportation

24

Equity Act: A Legacy for Users ("SAFETEA-LU") Technical Corrections Act of 2008 ("TCA") altered the FLSA and the MCA exemption. Spangler, 2017 WL 3412117, at *15. Once enacted, "[t]he TCA both restored–and therefore widened–the scope of the Secretary of Transportation's regulatory jurisdiction . . . *and* simultaneously narrowed the scope of the MCA exemption. It accomplished the latter by broadening the FLSA overtime requirement to covered employee[s] notwithstanding the MCA exemption." Aikins v. Warrior Energy Servs. Corp., Civil Action No. 6:13-CV-54, 2015 WL 1221255, at *4 (S.D. Tex. Mar. 17, 2015)(unpublished)(internal citations and quotations omitted). The TCA defines "covered employee" as "an individual":

(1) who is employed by a motor carrier or motor private carrier (as such terms are defined by section 13102 of title 49, United States Code, as amended by section 305);

(2) whose work, in whole or in part, is defined–

    (A) as that of a driver, driver's helper, loader, or mechanic; and

    (B) as affecting the safety of operation of motor vehicles weighing 10,000 pounds or less in transportation on public highways in interstate or foreign commerce . . . ; and

(3) who performs duties on motor vehicles weighing 10,000 pounds or less.

SAFETEA-LU Technical Corrections Act of 2008, Pub. L. No. 110-244, §§ 305-06, 122 Stat. 1572, 160-21 (June 6, 2008); Spangler, 2017 WL 3412117, at *15.

A.  **Motor Carrier Act Exemption**

Defendant argues that it properly classified Plaintiffs as exempt employees under the MCA.  Plaintiffs challenge this, contending that Defendant is not a motor carrier because it did not comply with certain regulations promulgated by the Secretary of Transportation and that Plaintiffs did not engage in interstate commerce.

1.  **DOT Jurisdiction**

When analyzing the MCA exemption, courts must first address whether Plaintiffs "are employed by carriers whose transportation of property by a motor vehicle is subject to" the jurisdiction of the DOT.  Songer v. Dillon Resources, Inc., 618 F.3d 467, 472 (5th Cir. 2010)(quoting 29 C.F.R. § 782.2(a)(1)).  To fall under the jurisdiction of the Secretary of the DOT, a motor carrier must engage in interstate commerce:

> Although the MCA defines interstate commerce as commerce "between a place in a state and a place in another state," it has not been applied literally by the courts. In fact, we have defined it as the actual transport of goods across state lines or the intrastate transport of goods in the flow of interstate commerce.

Id. (quoting Siller v. L&F Distributors, Ltd., No. 96-40549, 1997 WL 114897, at *1 (5th Cir. 1997)).

Defendant has declared itself as a registered motor carrier with the DOT.  Despite that declaration, Plaintiffs challenge whether Defendant can be properly considered a motor carrier, highlighting that it did not always comply with DOT regulations

with regard to its vehicles and drivers.  Plaintiffs point to the fact that drivers did not have to maintain commercial driver's licenses ("CDLs") or keep records of vehicle inspections, repair, and maintenance conducted, and were encouraged to underreport their hours.

This court has dismissed these types of arguments.  See Glanville v. Dupar, Inc., Civil Action No. H-08-2537, 2009 WL 3255292, at *8 (S.D. Tex. Sept. 25, 2009)(unpublished).  In Glanville, the court explained that "any violation of DOT regulations by [the defendant] would not affect whether the motor carrier exemption applies." Id. (citing Levinson v. Spector Motor Serv., 330 U.S. 649, 661 (1947); Barefoot v. Mid-America Dairymen, Inc., No. 93-1684, 1994 WL 57686, at *2 (5th Cir. 1994); Bilyou v. Dutchess Beer Distrib., Inc., 300 F.3d 217, 229 (2d Cir. 2002). "The question is not whether [the defendant] intended to be governed by the Department of Transportation or is in fact in compliance with Department of Transportation regulations, but rather whether [the defendant's] activities fall within the motor carrier practices over which the Department of Transportation has power and authority." Id. (quoting Collins v. Heritage Wine Cellars, Ltd., No. 07-CV-1246, 2009 WL 3255292, at *9 n.5 (N.D. Ill. Dec. 29, 2008)(unpublished)).

In support of their arguments, Plaintiffs cite Brennan v. Schwerman Trucking Co. of Va., Inc., 540 F.2d 1200 (4th Cir. 1976)

and argue that Defendant is not holding itself out as a motor
carrier, and therefore is not covered by the regulations.  However,
Brennan is not relevant, as it applied to the now-defunct ICC, and
the regulations have since been amended to remove the requirement
that a motor carrier "hold itself out to the general public" as a
motor carrier.  See Walters v. Am. Coach Lines of Miami, Inc., 575
F.3d 1221, 1227 n.12 (11th Cir. 2009)("We acknowledge that the
current version of the MCA no longer contains language indicating
that a company is subject to the act if it 'holds itself out to the
general public' as an interstate motor carrier.").  Regardless,
Defendant is a registered motor carrier with the DOT.

Plaintiff's challenges regarding the alleged violation of
certain DOT regulations do not prevent Defendant from falling under
the jurisdiction of the DOT.

### 2.  Affecting Safety in Interstate Commerce

Next, the court must look to whether Plaintiffs "engage in
activities that directly affect the operational safety of motor
vehicles in the transport of property in interstate commerce" under
the MCA.  Songer, 618 F.3d at 473 (29 C.F.R. § 782.2(a)(2)).  In
making this determination, courts look to whether the employees are
"likely to be . . . called upon in the ordinary course of [their]
work to perform . . . safety-affecting activities."  29 C.F.R. §
782.2(b)(3).  The MCA exemption applies "even in a workweek when
the employee happens to perform no work directly affecting safety

28

of operation so long as the employee's *continuing duties* involve
activities that affect motor vehicle safety in interstate
transport."   Songer, 618 F.3d at 475 (internal quotation marks
omitted)(quoting 29 C.F.R. § 782.2(b)(3)).

Plaintiffs argue, in their supplemental brief, that Defendant
has no evidence that it transported goods interstate.   However,
Defendant has provided evidence that this is not the case.   Field
engineers, in the course of their duties, transported oil field
equipment interstate, as testified by Alferez.   Plaintiffs also
admitted to traveling interstate to various job sites, sometimes
pulling trailers that contained goods to be used in performing
their job duties.   By arguing that Defendant did not transport
goods in interstate commerce, Plaintiffs also contradict their
earlier position.   In their complaint, they alleged that:

> Defendants' Field Engineer[s] and Trainees routinely use
> gloves, eye and ear protectors, hard hats, drilling
> equipment, lubrication, an Castor Oil [sic], hammers,
> wrenches, laptop computers, cell phones, and other tools,
> in performing their job duties. Thus the employees used,
> handled, sold, and/or worked on, goods or materials that
> were produced for or traveled in interstate commerce.[51]

It does not matter if each individual driver has driven in
interstate commerce; rather, per the regulations "if the employee's
job duties are 'such that he is (or . . . is likely to be) called
upon in the ordinary course of his work to perform, either
regularly or from time to time, safety-affecting activities' of a

---

[51]    See Doc. 1, Pl.'s Compl. p. 6.

driver, he comes within the MCA exemption 'in all workweeks when he employed at such job." <u>Songer</u>, 618 F.3d at 474 (quoting 29 C.F.R. § 782.2(b)(3)).

> This general rule assumes that the activities involved in the continuing duties of the job in all such workweeks will include activities which have been determined to affect directly the safety of operation of motor vehicles on the public highways in transportation in interstate commerce. Where this is the case, the rule applies regardless of the proportion of the employee's time or of his activities which is actually devoted to such safety-affecting work in the particular workweek, and the exemption will be applicable even in a workweek when the employee happens to perform no work directly affecting "safety of operation."

<u>Id.</u> (quoting 29 C.F.R. § 782.2(b)(3)). Per the DOT, "a driver will remain under the [Secretary's] jurisdiction . . . for as long as the driver is in a position to be called upon to drive in interstate commerce as part of the driver's regular duties." <u>Id.</u> (quoting Application of the Federal Motor Carrier Safety Regulations, 46 Fed. Reg. 37,902, 37,903 (Dep't of Transp. July 23, 1981)(notice of interpretation)). Courts look on a company-wide, rather than an employee-by-employee basis, when determining whether drivers engaged in interstate commerce. <u>Allen</u>, 755 F.3d at 285-86; <u>see also</u> <u>Barefoot v. Mid-America Dairymen, Inc.</u>, No. 93-1684, 1994 WL 57686, at *3 (5th Cir. 1994)(per curiam). "'[I]t is the character of the activities, rather than the proportion of the employee's time or activities' that determines the jurisdiction of the Secretary under the MCA." <u>Barefoot</u>, 1994 WL 57686, at *3 (quoting <u>Morris v. McComb</u>, 332 U.S. 422, 431 (1947); <u>Levinson v.</u>

Spector Motor Serv., 330 U.S. 649, 674 (1946)).

The summary judgment evidence demonstrates that Plaintiffs regularly engaged in interstate commerce. The monthly work reports and summary document created by Defendant show that during most months of the relevant time period, Plaintiffs were traveling between states in the course of their duties as field engineers. Plaintiffs focus on the fact that field engineers stationed in Alaska and Louisiana did not drive interstate while working at these offices. However, as discussed in the cases above, this issue is not analyzed on an individual-employee basis. Additionally, there is evidence that field engineers moved to different satellite offices and drove interstate.

Finally, Plaintiffs also assert application of the four-month rule bars application of the MCA, contending that Defendant failed to satisfy its burden in demonstrating that Plaintiffs meet this requirement. The four-month rule is found in a DOT Notice, mandating that "driver's 'involvement with interstate motor vehicle transportation' not occur 'more than four months prior to the pay period at issue.'" Olibas v. John Barclay Native Oilfield Servs., LLC, CIVIL ACTION NO. 3:11-CV-2388, 2014 WL 12602869, at *11 (N.D. Tex. Mar. 2, 2014)(unpublished)(quoting Vidinliev v. Carey Int'l, Inc., 581 F. Supp.2d 1281, 1286 (N.D. Ga. 2008)). In Olibas, the court stated that "instead of mechanically applying the DOT's rule to ferret out four month gaps in a driver's interstate commerce

travel time, courts use the rule as intended–'to prevent employers from circumventing the maximum hour provisions of the FLSA by claiming that their employees are used in interstate commerce even though the likelihood of an employee being sent on an interstate run is remote.'" Id. (quoting Johnson v. Hix Wrecker Serv., Inc., 651 F.3d 658, 663 (7th Cir. 2011)).

The evidence in this case appears undisputed that the field engineers' job descriptions required that they could be called upon regularly to make trips in interstate commerce.  And the evidence shows that they drove regularly in interstate commerce.  As explained in Olibas, it does not matter if the evidence ultimately demonstrates that some of the drivers did not actually engage in interstate commerce during four-month periods within the scope of this case.  There is testimony from Plaintiffs that they regularly worked and traveled to bases in other states in the course of their position as field engineers.  Additionally, the monthly work reports show that in almost every month of the relevant period, Plaintiffs engaged in interstate travel.  Plaintiffs have not pointed to relevant evidence challenging these points, and, therefore, they have not raised a fact issue that the MCA exemption should not apply in this case.  The court that Plaintiffs have not raised a fact issue concerning the applicability of the MCA exemption.

**B.  <u>Technical Corrections Act</u>**

While this motion was pending, the Fifth Circuit issued Carley, in which the court decided which party had the burden of proving vehicle weight under the TCA. As the Fifth Circuit acknowledged, the text of the TCA did not explicitly establish who had the burden of proof, and there was no Fifth Circuit precedent on this issue. Carley, 890 F.3d at 579. The court decided that the TCA is not an FLSA exemption, but rather, it "codifies conditions under which § 207(a) requires overtime pay notwithstanding the MCA exemption." Id. at 580. Therefore, the court held that the burden of proving that vehicle weights are under 10,000 pounds falls on a plaintiff, not on the employer. Id.

The Carley court also addressed what the "proper measure of weight" should be TCA, as the TCA does not define "weight." 890 F.3d at 581. The court looked to the DOL's bulletin stating that the DOL utilized GVWR to determine vehicle weight and concurred with the Eighth Circuit's holding that GVWR is the proper measurement of vehicle weight under the TCA. Id. at 580-82 (citing McCall v. Disabled Am. Vet., 723 F.3d 962, 966 (8th Cir. 2013); Skidmore v. Swift & Co., 323 U.S. 134 (1944)).

Therefore, to raise a fact issue on Defendant's motion for summary judgment, Plaintiffs must provide competent summary judgment evidence that they fall under the coverage of the TCA by showing that their work affected the safety of vehicles with GVWRs under 10,0000 pounds. In Spangler, decided prior to Carley, the

33

court explained that "[t]o establish entitlement to summary judgment, an employer must provide evidence either that its employees exclusively drove vehicles greater than 10,000 pounds during a relevant workweek, or that any work with smaller vehicles was merely *de minimis* work." 2017 WL 3412117, at *17 (citing <u>Roche v. S-3 Pump Serv., Inc.</u>, 154 F. Supp.3d 441, 448-49 (W.D. Tex. 2016)). Now, <u>Carley</u> has explicitly put this burden on Plaintiff. However, still looking to <u>Spangler</u> for guidance but placing the burden on Plaintiffs, the court will analyze whether Plaintiffs have provided evidence to show that any work with smaller vehicles was more than merely de minimis work. See <u>Carley</u>, 890 F.3d at 579-80; <u>Spangler</u>, 2017 WL 3412117, at *17.

Plaintiffs have made several attempts in the evidence to demonstrate the weights of the smaller vehicles they occasionally drove. <u>Carley</u> stated that the proper measure of weight is the GVWR. 890 F.3d at 582. Attached to their response to the motion for summary judgment are printouts from the Highway Loss Institute that contain "weights" of test vehicles, not the GVWR. Plaintiffs also provide bigrigvin.com reports that only contain "gross weight," not the GVWR. In response to Defendant's second supplemental authority, noticing the court of the <u>Carley</u> case, Plaintiffs ask the court to take judicial notice of the weights of the smaller vehicles through website links, stating that the GVWR data is available on the car manufacturer's websites. The links

provided by Plaintiffs go to a variety of websites, including car rental sites, the National Highway Transportation Safety Administration site, and some of the car manufacturer's sites. Some of these links do not work or take the reader to websites that do not show the GVWR.

A judicially noticed fact "must be one not subject to reasonable dispute in that it is either (1) generally known within the trial court's territorial jurisdiction or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Plaintiffs' request that the court take judicial notice of the GVWRs of the other vehicles driven by them are not facts that satisfy either prong of this rule.

To the extent that the links provided by Plaintiffs show GVWRs for similar vehicles, they do not show the GVWRs for the specific vehicles driven by Plaintiffs. Defendant's evidence, namely, the spreadsheets provided, link specific VIN numbers of Defendant's vehicles with the GVWRs of those specific vehicles. The best that Plaintiffs can provide the court is some GVWRs for the general make and model of the vehicle. However, without knowing the exact year or VIN number of these vehicles, it is unclear whether the numbers provided by Plaintiffs are the actual GVWRs for the vehicles driven by Plaintiffs.

The only smaller vehicles for which the court has the actual

35

GVWR corresponding to the vehicles that Plaintiffs drove are those provided in Defendant's spreadsheets, such as the shop trucks in Houma, Louisiana.  This is the only competent evidence the court has of GVWR of these smaller vehicles Plaintiffs drove.  The evidence does not show to what extent Plaintiffs drove these shop vehicles in Houma.  In fact, Plaintiffs contend that when field engineers were based in Houma, they did not engage in interstate commerce.  As to the other vehicles, for which the court has no competent summary judgment evidence of their GVWRs, even if the GVWRs were known and under 10,000 pounds, summary judgment would still be proper, as Plaintiffs have not raised a fact issue that driving these vehicles was more than "de minimis."  Plaintiffs' testimonies on this point indicate that rental or personal cars were driven on a some of the time, that smaller vehicles were located at the offices, or that back seats were removed from larger trucks.  Therefore, even if Plaintiffs had competent evidence of the corresponding GVWRs to demonstrate that some of these vehicles were under 10,000 pounds, Plaintiffs have not raised a fact issue showing that these vehicles were driven on more than a de minimis basis.  Therefore, the TCA does not apply, and Plaintiffs are exempt from the FLSA under the MCA.

## V.  Conclusion[52]

---

[52]     As the court finds that Plaintiffs fall under the MCA exemption and are not covered by the TCA, the court will not address the other arguments raised as the court finds that summary judgment should be granted on Plaintiffs' claims.

Based on the foregoing, the court **RECOMMENDS** that Plaintiffs' motion to strike be **DENIED** and Defendant's motion for summary judgment be **GRANTED**.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 22nd day of June, 2018.

_____
U.S. MAGISTRATE JUDGE